# UNITED STATES DISTRICT COURT
for the

District of

Division



FILED
JUL 24 2025
Clerk U.S. District Court
Greensboro, NC
By ___

Bryan William Krehnbrink
_____
*Plaintiff(s)*
(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)

-v-

University of North Carolina School of Medicine
_____
*Defendant(s)*
(Write the full name of each defendant who is being sued. If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names. Do not include addresses here.)

Case No. 25CV661
(to be filled in by the Clerk's Office)

Jury Trial: (check one)  ☒ Yes  ☐ No

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
(Non–Prisoner Complaint)

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

- **Name:** Bryan William Krehnbrink
- **Address:** 158 Quarter Gate Trce
  - City: Chapel Hill
  - State: NC
  - Zip Code: 27516
- **County:** Chatham
- **Telephone Number:** 919-264-6378
- **E-Mail Address:** BKChapelHIll@gmail.com

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

**Defendant No. 1**
- **Name:** University of North Carolina School of Medicine
- **Job or Title** (if known):
- **Address:** 321 S. Columbia Street
  - City: Chapel Hill
  - State: NC
  - Zip Code: 27599
- **County:** Orange
- **Telephone Number:** 919- 962-8335
- **E-Mail Address** (if known):

☐ Individual capacity ☐ Official capacity

**Defendant No. 2**
- **Name:**
- **Job or Title** (if known):
- **Address:**
  - City:
  - State:
  - Zip Code:
- **County:**
- **Telephone Number:**

E-Mail Address *(if known)* _____

☐ Individual capacity    ☐ Official capacity

Defendant No. 3
Name _____
Job or Title *(if known)* _____
Address _____
_____
*City*        *State*        *Zip Code*
County _____
Telephone Number _____
E-Mail Address *(if known)* _____

☐ Individual capacity    ☐ Official capacity

Defendant No. 4
Name _____
Job or Title *(if known)* _____
Address _____
_____
*City*        *State*        *Zip Code*
County _____
Telephone Number _____
E-Mail Address *(if known)* _____

☐ Individual capacity    ☐ Official capacity

## II. Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A. Are you bringing suit against *(check all that apply)*:

☐ Federal officials (a *Bivens* claim)

☒ State or local officials (a § 1983 claim)

B. Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

Plantiff asserts that the following federal constitutional and statutory rights were violated by state officials acting under color of law:

**First Amendment – Freedom of Speech and Right to Petition the Government:**
Mr. Krehnbrink engaged in protected speech and whistleblowing activity when he submitted an advocacy letter to the Dean of the UNC School of Medicine raising concerns about discriminatory practices and ethical violations within the Department of Psychiatry. In response, Mr. Krehnbrink was subjected to retaliatory actions, including non-renewal of his contract. These adverse employment actions were taken in retaliation for my constitutionally protected speech and advocacy.

**Title VII of the Civil Rights Act of 1964 – Anti-Retaliation Provision**
Protected Right: Title VII protects employees from retaliation when they File a complaint or grievance about discrimination based on race, sex, religion, color, or national origin. UNC's office of EOC has ruled Plantiff engaged in a protected activity and suffered an adverse action. UNC's office ruled this was not "more likely then not" due to the grievance. This was despite clear evidence the day after the grievance filing of increased scrutiy, an effort by Dr. Meltzer-Brody to terminate plantiff, and a secret job reassignement, all within 3 days after the grievance filing, while the Plantiff was out on vaction. Dr. Meltzer-Brody and staff would say the grievance had nothing to do with these actions. Later testimony in the conflict of interset claim, Dr. Meltzer Brody herself would use the mutually exclusive defense the reassginment wasn't due to a conflict of interst, that the reassignement was directly due to the greivance. UNC EOC would ignore this confession of retaliation as "a separate case".

**Fourteenth Amendment – Equal Protection Clause:**
Mr. Krehnbrink was removed from my position based, in part, on sex and race, while other similarly situated individuals outside his protected class (i.e., female and/or non-Caucasian employees) were treated more favorably. This constitutes discrimination in violation of the Equal Protection Clause.

**Fourteenth Amendment – Due Process Clause:**
Plantiff had a protected property interest in continued state employment and in the grievance process, given my 10 years of state service. The University failed to provide adequate notice, a fair process, or an impartial review of my non-renewal and reassignment, depriving me of procedural due process.

**Title VII of the Civil Rights Act of 1964 (as a basis for retaliation and discrimination):**
Although Title VII is ordinarily enforced through the EEOC process, the discriminatory and retaliatory treatment Plantiff experienced also forms the factual basis for my §1983 claims where they overlap with constitutional rights.

Accordingly, Plantiff seeks redress under 42 U.S.C. § 1983 for these violations by officials of the University of North Carolina School of Medicine acting under color of state law.

C. Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

n/a

D. Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

University of North Carolina School of Medicine (UNC SOM)
UNC SOM is a public institution and part of the University of North Carolina system, which is an arm of the State of North Carolina. As such, its policies, practices, and personnel decisions are made under the authority of state law and state-funded operations. All relevant actions involving employment, grievance procedures, and patient care policies were taken under color of state law.

Dr. Samantha Meltzer-Brody
Dr. Meltzer-Brody, as Chair of the Department of Psychiatry at UNC SOM, was a state employee acting in her official capacity when she made decisions regarding Mr. Krehnbrink's employment, salary, reassignment, and clinical access. Her actions, including alledged retaliation and participation in reputational harm, were taken under the authority of her state-funded leadership role and in accordance with university policies, thus under color of state law.

Dr. Zachary Hall
Dr. Hall, serving in an administrative and supervisory role, participated in or approved adverse employment actions against Mr. Krehnbrink while acting in his capacity as a UNC SOM employee. His role in coordinating or authorizing Mr. Krehnbrink's reassignment and contributing to patient miscommunication was exercised through state authority, and thus under color of state law.

Other University Officials Involved in the Grievance Process to inclue UNC's Office of Equal Opportunity and Complaice-
University administrators who delayed or denied a fair grievance process acted under the policies and procedures of a state agency and in their roles as public employees. Their failure to provide due process and their participation in the retaliation were conducted under the color of law.

## III. Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. Where did the events giving rise to your claim(s) occur?

UNC Hospital in Chapel Hill North Carolina @ 101 Manning Dr, Chapel Hill, NC 27514 & UNC Psychiatry Clinic @ 77 Vilcom Center Dr #300, Chapel Hill, NC 27514

B. What date and approximate time did the events giving rise to your claim(s) occur?

July 26, 2023 @ 8am through ongoing

C. What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

1. The Plaintiff, Bryan Krehnbrink, is a qualified and experienced Psychiatric Mental Health Nurse Practitioner, duly licensed by the North Carolina Board of Nursing. Mr. Krehnbrink commenced his employment with the University of North Carolina School of Medicine in 2018, serving as 'Faculty' in the role of Clinical Instructor. He was classified as an employee of the State of North Carolina, and his employment has been governed by one-year contracts, which are presumed to automatically renew, absent cause for termination or funding constraints.

2. Throughout the duration of his employment with the School of Medicine, Mr. Krehnbrink had consistently received exemplary performance reviews. Mr. Krehnbrink is a highly regarded, award-winning practitioner who provided hospital coverage in the inpatient psychiatric units, delivered outpatient psychiatric medication management services to over 200 patients at UNC Psychiatry's Vilcom Outpatient Clinic in Chapel Hill, and who rose to the occasion during the pandemic to manage an innovative Emergency Room diversion clinic for mental health patients in the UNC Hospital in Chapel Hill.

3. Mr. Krehnbrink did not a salary increase for the contract year July 2021-2022. Dr. Meltzer-Brody stated in departmental meetings that raise monies were being allocated to DEI in support of BLM. Staff were told raise priorities were for persons with claims of DEI ethnicity, orientation or gender. Staff were told in departmental meetings those complaining about this were unwelcome in the department.

4. Mr. Krehnbrink was notified in September 2022 that he would again not be getting a salary increase for the contract year July 22022-2023. Dr. Meltzer-Brody stated in departmental meetings that raise monies were being allocated to gender equity. This designation again excluded Mr. Krehnbrink as a male. Again staff were told in departmental meetings those complaining about this were unwelcome in the department.

5. Mr. Krehnbrink asked Dr. Meltzer-Brody for a written explanation why he hadn't gotten a raise two years in a row, despite exemplary reviews and work in the hospital Emergency Department during a pandemic. Dr. Meltzer-Brody refused this request. It is noted all other state employees were getting 3 and 3.5% raises per state legislature. UNC SOM providers are not eligible for those raises because they have incentive plans.

6. On September 28, 2022, Plaintiff Bryan Krehnbrink submitted a written advocacy letter to Dr. Wesley Burks, Dean of the University of North Carolina School of Medicine, raising formal concerns regarding alledged discriminatory practices and ethical irregularities within the Department of Psychiatry under the leadership of Department Chair Dr. Samantha Meltzer-Brody. In the letter, Plaintiff expressly supported the general principles of Diversity, Equity, and Inclusion (DEI) and gender equity initiatives. However, he objected to what he viewed as their misapplication in practice—specifically, that for two consecutive years, the supposed 'inclusion' was in practice an exclusion of Caucasian male employees and that there should be a minimum raise for those with good reviews.

7. Plaintiff further noted that despite the department's stated DEI goals, there was no observable improvement in ethnic diversity among faculty or leadership positions. A review of publicly available salary data revealed that the majority of DEI-designated funds appeared to have been directed towards generous 10%+ raises for existing females in leadership positions, contradicting the initiative's purported aim of increasing underrepresented minority representation. When questioned, department leadership responded that DEI encompassed "all women" as "historically marginalized," a characterization Plaintiff found inconsistent with the department's existing demographic makeup, which was already predominantly female and led by a female Chair. Plaintiff contends that, as applied, the department's DEI policies operated to such an extreme that they were not promoting inclusion, they were so specific to be discriminatory and exclusionary only towards heterosexual Caucasian men, including himself.

8. Dean Wesley Burks did not respond to the letter. Dr. Meltzer-Brody defended the two years of no salary increase to Mr. Krehnbrink by building nurse practitioner pay scales after the claim and saying Mr. Krehnbrink's total final compensation was in range for his role. What Dr. Meltzer-Brody ignored was that 22% of Mr. Krehnbrink's total final compensation was incentive pay earned by working extra weeks during the pandemic instead of taking vacation. Mr. Krehnbrink was effectively penalized for working overtime in a hospital emergency department during the Covid Pandemic.

9. Extreme DEI policies at UNC SOM Psychiatry when Dr. Meltzer-Brody became chairperson

resulted in the ratio of male to female staff to go from approximately 50/50 to 30/70. New resident classes historically were 50/50 male to female. The new resident class of 2023-2024 had 2 males and 14 females. Interestingly, all DEI activity has been wiped from the UNC SOM Psychiatry website, previous posts about DEI deleted, and they have reassigned previously identified DEI staff.

10. Nine months went by without a single word about Mr. Krehnbrink's job performance or any conversation about the letter. Mr. Krehnbrink requested multiples of times for a transfer to UNC Health's Advance Practice Center. UNC SOM had concluded that nurse practitioners in their department had unique roles and that departmental guidelines and policies were for doctors. Most other departments in the UNC SOM had already transferred their nurse practitioners. This was a reasonable request to avoid future issues and Dr. Meltzer-Brody denying this was contraindicated to UNC SOM guidance. The plaintiff alleges the only reason for Dr. Meltzer-Brody to keep the plaintiff, whom she obviously disliked, in her department was so she could give him a 'silent firing'.

11. On June 26, 2023, Dr. Samantha Meltzer-Brody and Matt O'Neal, Business Manager, invited Mr. Krehnbrink to a "check-in meeting" which turned out to be a two-minute ambush notification that they were giving Mr. Krehnbrink given notice his employment contract with the University of North Carolina (UNC) School of Medicine would not be renewed when it expired in 90 days. There was no reason given and it is now known there was neither cause nor a budgetary issue. Documents would later show the sole reason for the nonrenewal was Dr. Meltzer-Brody's dislike of the advocacy letter, which was a protected activity. All 5 other female nurse practitioners had their contracts renewed. North Carolina is an at will employment state but employees of the state of North Carolina do have protections that require there to be some justifiable reason for separation. There had been not been a single job performance related issue as is required to show that the non renewal was not for writing the letter. Mr. Krehnbrink was told his last day of employment would be October 14, 2023 and that he was expected to work his remaining days as scheduled. This 'silent firing' was for a protected activity. This notice was three days before a previously planned 3.5 week vacation Mr. Krehnbrink was taking now that the pandemic was easing and his hospital work was wrapping up. The notice didn't give Mr. Krehnbrink time to seek alternative employment that would have allowed patients under his care to choose between staying with UNC or following him to a different clinic. It is noted that UNC SOM Psych is a teaching clinic and that the clinic didn't have the desire or staff to care for patients under Mr. Krehnbrink's care.

12. On June 28th Mr. Krehnbrink consulted with an employment attorney and was advised to adhere to all directives issued by UNC. This is something Mr. Krehnbrink has done at all times, even if he found them illegal or unethical. Mr. Krehnbrink was told the proper place to address his thoughts towards the non renewal would be in a grievance.

13. Mr. Krehnbrink researched all procedures and recommendations by Boards and Associations. While "lame duck" employment situations are inherently challenging, the North Carolina Medical Board has issued clear guidance, emphasizing that such situations should not negatively impact patient care, explicitly stating that "professional divorces must not affect patient care."

14. On June 28th Mr. Krehnbrink also spoke with human resources. Mr. Krehnbrink had 12 weeks of time remaining on his contract and 10 weeks of vacation saved from working in the hospital during the Covid Pandemic. Mr. Krehnbrink asked if this would be paid out or if he could use some of the vacation time and he was told vacation would not be paid out and that he had to work his remaining days as scheduled and that "not having used it is your problem". He was told he could ask to use some, but UNC SOM doesn't have to approve it.

15. On June 29th Mr. Krehnbrink left for a previously planned 3.5 week vacation to run a ten day ultramarathon.

16. On July 9, 2023, Mr. Krehnbrink filed a formal grievance detailing and alleging the issues of discrimination, that the non-renewal of his contract constituted retaliation for engaging in the protected activity of emailing his concerns to the Dean, and a conflict of interest claim with Dr. Meltzer-Brody.

17. The conflict of interest claim is not asked to be settled in this suit, it is mentioned though as relevant to the complexities of this case. Mr. Krehnbrink had independently and with approval from UNC (inventor owned and with an External Professional Activies approval), taken his privately developed mental health intake app, Inclusive Intakes Inc. through UNC Chapel Hill's Launch Business accelerator. Mr. Krehnbrink had updated Dr. Meltzer-Brody on this activity. Unbeknownst to him,

Dr. Melter-Brody was a 'partner' in an all female "femtech" mental health app start up headquartered there. Mr. Krehnbrink was successful in the program and attention on his working app and business progress took away attention from We Are Exo's non working app geared towards post partum depression. There was resentment from the woman in the We Are Exo staff towards Mr. Krehnbrink. Invitations to do important entrepreneurial things like speak at the UNC School of Business on health tech start-up's started going from We are Exo to Mr. Krehnbrink. There was room for both entities to succeed but We Are Exo didn't have a working product and they had worn out interest by repeating "fem-tech" for two years without delivering a product. We Are Exo would eventually ceased health care app development. Mr. Krehnbrink alleges Dr. Meltzer-Brody should not have been making decisions regarding not renewing the contract when they had competing outside interests. It is relevant here because there was such an emphasis by We are Exo on being woman led and their team not liking one man doing better then they were. It is also relevant because We are Exo's CEO, Emily Maginn would be quoted in numerous places in UNC documentation, but she didn't work for UNC. Dr. Meltzer-Brody would use these against Mr. Krehnbrink, but would later in the conflict of interest hearing deny any offical affiliation, despite significance evidence to the contrary.

18. On July 10, 2023—just one day after Mr. Krehnbrink filed a formal grievance—Dr. Samantha Meltzer-Brody initiated a retaliatory course of action by launching an internal email chain explicitly labeled in the subject line as "terminating provider," in which she expressed a clear and predetermined intent to terminate Mr. Krehnbrink. In that communication, Dr. Meltzer-Brody addressed newly placed staff at the beginning of the month, invoking what she described as a "similar situation" from the prior year in which another provider was terminated within two days for posting negative remarks about the department on social media. Drawing an equivalence between filing a lawful workplace grievance and posting disparaging comments online demonstrates a willful disregard for Mr. Krehnbrink's protected rights under employment and whistleblower law. Notably, Mr. Krehnbrink had not posted anything on social media, he was off doing his ultramarathon. Dr. Meltzer-Brody's comparison and immediate efforts to coordinate Mr. Krehnbrink's termination strongly support an inference of unlawful retaliation.

19. No one on Dr. Meltzer-Brody's staff pointed out filing a grievance is a protected activity and that they shouldn't be working to terminate Mr. Krehnbrink. Neither staff nor human resources stepped up to remind Dr. Meltzer-Brody that the procedure after a conflict-of-interest claim would be for one to reclus themselves from further administrative decisions. UNC EOC investigators would later point out Dr. Meltzer-Brody told them she had reclused herself after the filing but they pointed out she was directly involved in every email, phone call, and decision regarding Mr. Krehnbrink.

20. Staff accessed Mr. Krehnbrink's email account, monitored his social media activity, and clinic leadership spoke with multiples of clinic staff and tasked them with finding justification for immediate termination. This was direct increased scrutiny, the day after the grievance filing, while Mr. Krehnbrink was on vacation.

21. Despite an exhaustive review of Mr. Krehnbrink's activities over the past four years, only minor issues were identified, all after the contract non renewal, and all minor, like the forwarding of an email to his private account. There wasn't anything to justify a termination. On July 12, 2023, Dr. Meltzer-Brody issued an email stating an internal agreement of her executive staff that Mr. Krehnbrink would no longer see patients as a UNC School of Medicine provider. Mr. Krehnbrink asserts this reassignment was an illegal retaliation for filing his grievance. The reassignment involved removal from patient care and his new role would later be clarified as the menial task of drafting a single-page report over his final two months. This abrupt change occurred just three days after the grievance filing, while Mr. Krehnbrink was running an ultramarathon and couldn't possibly have done anything wrong in that timeframe. There was clear demonstration of proximity, increased scrutiny, retaliation and the proof of Dr. Meltzer-Brody's ill will was the insult or sick joke of having Mr. Krehnbrink spend his final two months writing a one page paper on the topic of technology in psychiatry- this was a reference to their competing health tech apps in the UNC Chapel Hill launch program.

22. The contract nonrenewal for writing the letter to the dean and then the heightened scrutiny of Mr. Krehnbrink, the effort to terminate his employment, his abrupt clinical reassignment, and the imposition of menial tasks served not only as retaliation against him personally, but also as a clear and calculated warning to other employees. These actions sent an unmistakable message that engaging in protected activities such as writing a letter to the dean or filing a grievance—would be met with

punitive consequences. The treatment of Mr. Krehnbrink created a chilling effect within the department, discouraging others from asserting their rights or raising legitimate concerns for fear of similar retaliation.

23. If UNC Psychiatry had legitimate concerns about Mr. Krehnbrink's professionalism or performance regarding what he wrote in his grievance, such concerns could and should have been formally raised. However, no such argument has ever been presented.

24. Mr. Krehnbrink was not informed of his internal reassignment. It is alleged this omission was deliberate, as they were aware Mr. Krehnbrink was speaking with a lawyer, and they knew disclosing the reassignment 3 days after filing the grievance would have been a clear illegal retaliatory action. Instead, it is alleged they schemed an obvious cover up.

25. Upon returning to Chapel Hill from his ultramarathon, on July 18, 2023, while still on vacation, Mr. Krehnbrink contacted Dr. Hall, new in his role as clinic director, as a courtesy, and per his request to plan his remaining two months of work. Mr. Krehnbrink was trying to work through a difficult situation and Mr. Krehnbrink was aware the clinic he actually worked at had nothing to do with, and was completely surprised by the non-renewal. Mr. Krehnbrink requested to schedule some vacation on days no patients had yet been scheduled. Dr. Hall said he approved of Mr. Krehnbrink for all his vacation plus extra so that he didn't have to come back from vacation. This offer seemed generous but was contingent on his agreement not to return to patient care and that he have no further contact with patients, not be allowed to notify patients, and that he would have no input on transitional plans for patients. Mr. Krehnbrink was confused, he left for vacation with the threat of termination if he took any vacation and now he was being told not to return and go on an extended vacation. All that had changed was the filing of grievance.

26. Mr. Krehnbrink was taking care of 200+ mental health patients, in some cases for 10+ years. He could not go out on vacation and just not come back. This would have violated professional standards for patient care and transitions as outlined by the NC Board of Medicine and the American Psychiatric Association. As a most obvious example, a mental health provider can't ghost a patient being seen for abandonment issues.

27. Mr. Krehnbrink declined UNC's offer for extended vacation, citing professional and ethical obligations to transition his patients appropriately.

28. Dr. Hall had failed Dr. Meltzer Brody's expectations that he terminate Mr. Krehnbrink and he had now failed to get Mr. Krehnbrink to 'disappear' on vacation. The third attempt at meeting the secret reassignment goal is alleged to be intentionally frustrating Mr. Krehnbrink so Dr. Hall could justify a reassignment with "professionalism concerns". UNC attempted to fabricate post-hoc justifications for their already completed reassignment by using minor issues and Mr. Krehnbrink's advocacy for appropriate mental health care standards as "concerns for professionalism". These after-the-fact defenses are irrelevant to the core legal issue of the retaliation. It had already been done with the July 13 internal reassignment.

29. Sensing his return was unwelcome, Mr. Krehnbrink sought to align with professional board guidance to try and work things out in the best interest of the patients and proposed an "express departure plan" to Dr. Hall. This plan, communicated via email on July 22, 2024, outlined his willingness to return for two weeks to notify patients, conduct final visits for those in need, and coordinate ongoing care with other professionals. Mr. Krehnbrink explicitly stated in writing that his disputes with UNC Psychiatry were not his to burden patients. Dr. Meltzer-Brody and Dr. Hall rejected this plan.

30. Unable to reach an agreement on a brief departure plan, Mr. Krehnbrink returned to work as scheduled, intending to conduct a two-month "long transition" plan, which he understood to be in place prior to filing his grievance. However, before seeing his first patient, Mr. Krehnbrink was called into a meeting with Matt O'Neal, UNC SOM Psychiatry's Business Manager where he was officially reassigned out of clinical duties and was given no explanation. He was told he was prohibited from contacting his patients and relegated to the menial task of drafting a single-page document for the remainder of his contract.

31. The reassignment caused immediate and significant disruption to patient care. Patients that had appointments that morning, waiting for Mr. Krehnbrink's return from extended vacation, were informed that "Mr. Krehnbrink is gone," "Mr. Krehnbrink left," or similar ambiguous statements by schedulers.

The messaging gave the impression that Mr. Krehnbrink had abandoned them, all while he was sitting at his computer, ready to see them as scheduled. One patient, misunderstanding the situation, suffered a panic attack and had to be directed to the office manager because the patient believed from the messaging that Mr. Krehnbrink had passed away because that is what they understood from "he's gone and that is all we can say".

32. The abrupt and unexplained reassignment led to reputational harm among colleagues, as it insinuated legal or ethical misconduct, the only reason providers would be pulled out of clinical duties by UNC SOM on the day they have scheduled appointments. It is alleged this was UNC SOM's intent as notice of a new provider should have been done right after the July 12th decision. UNC Psychiatry had an obligation to immediately Mr. Krehnbrink and to notify patients of a provider transition at that time. The North Carolina Board of Medicine's recommendation is providing 30 days' notice to patients and UNC Psychiatry would end up shocking patients with the reassignment, in some cases, moments before scheduled visits.

33. UNC's later official explanation for the reassignment was concerns for professionalism and what Mr. Krehnbrink "might say or do". Mr Krehnbrink and his patients deserved an attempt at proper transitions. Punishing them both for "might say or do" was unnecessary when there were opportunities first for mentoring, supervision, joint visits, and/or auditing before the drastic step of the reassignment.

34. UNC would later argue for a low bar for reassigning a provider for mental health patient care. All professional guidance suggests a high bar for removing a provider with long established relationships. In some cases, these were patients who followed Mr. Krehnbrink from a previous clinic 5 years prior and had been under his care for 10+ years. They were led to believe he left without even a goodbye. HIPAA prevents case details being addressed in this filing, but as one general example of the importance of a proper transition, Mr. Krehnbrink had a multiyear relationship with a teen with a chronic illness and abandonment issues. Mr. Krehnbrink worked for several years with the teen, and in collaboration with their parent, the teen's therapists, and the teen's medical team. UNC Psychiatry ended up handling this situation by surprising the teen patient with "Mr. Krehnbrink left" and there was no heads up to the parent, and there was no care coordination with the medical team or the child's therapist. All were led to believe this was Mr Krehnbrink's decision or fault and that he chose not to properly wrap up care. Mr. Krehnbrink believes that teen deserved a last transitional visit and a plan for the future, ideally with an introduction to their new provider. Mr. Krehnbrink believes the parent deserved a call/heads up and that a plan should have been put in place for moving forward with care with the medical team. Mr. Krehnbrink was a 10 year professional and had made it clear he could separate his departmental concerns from professional care.

35. Notwithstanding the confidentiality inherent in psychiatric care, approximately fifteen (15) former patients have contacted Plaintiff to express their willingness to provide sworn testimony regarding the harm and disruption caused by Plaintiff's sudden removal from their care. These individuals have indicated a readiness to assist Plaintiff in any way, including by serving as witnesses in this matter.

36. Minutes after the reassignment, UNC deleted Mr. Krehnbrink's EPIC account, severing patient communication pathways. This was against protocol and malicious in denying patients any way of communication with a provider or the clinic. Protocol is the retention of a departing providers' account so messages can be forwarded to a covering provider, like what happens when a provider goes on vacation. Patients trying to find Mr. Krehnbrink in UNCMyChart found him completely deleted with no alternative provider or means of contact to the clinic.

37. The lack of transition coordination quickly severely harmed Mr. Krehnbrink's professional reputation within his referral network. Therapists and primary care providers received no notification Mr. Krehnbrink was leaving UNC, a severe breach of standard of care, and they were left fielding frantic calls from patients who said "Mr. Krehnbrink disappeared" and "we don't even know who to call". Without epic access, Mr. Krehnbrink had no ability to coordinate care and he had been told he couldn't reach out to other providers.

38. Mr. Krehnbrink started getting "off the record" calls from clinic staff with patient concerns and patients were tracking him down on facebook, linked-in, Instagram, his personal cell, and even in his community.

39. Recognizing the harm being done, Mr. Krehnbrink offered to return to the clinic to assist with

patient transitions and suggested he could make joint calls to the patients with a social worker. This would have negated any concerns for professionalism and allowed for a planned transition. This offer was denied by Dr. Hall. Communications kept getting increasingly distressed. As an example, an Autistic patient reached out directly to Mr. Krehnbrink's private email that he found to confirm that he "didn't have to take his medication anymore and didn't have to go to psychiatry anymore" because the clinic schedulers told him "Mr. Krehnbrink left, you don't have to come back". Mr. Krehnbrink emailed Dr. Hall with an offer to 'run the list' with clinic staff to at least identify plans and needs. This offer was also declined.

40. Mr, Krehnbrink reached out to UNC School of Medicine's legal department and to the Human Resources department and they were of no help in stopping the mental health harm being done to 200+ patients.

41. Mr. Krehnbrink filed formal complaints with the North Carolina Medical Board against Dr. Samantha Meltzer-Brody and Dr. Hall in response to their conduct during the events in question. However, the University of North Carolina School of Medicine Psychiatry actively shielded both individuals from scrutiny by crafting and disseminating a false narrative to patients—namely, that Mr. Krehnbrink was solely responsible for the disruption in their care and had voluntarily abandoned his clinical responsibilities. In reality, the disruption was the result of coordinated administrative actions by UNC SOM Psychiatry leadership. Because patients were misled and unaware of the institution's role, no complaints were submitted by them to the Medical Board. This lack of third-party reporting—paired with Mr. Krehnbrink's ethical refusal to solicit complaints from mental health patients—limited the Board's ability to investigate further. This calculated manipulation not only damaged Mr. Krehnbrink's professional reputation, but also interfered with the regulatory oversight process. Later, Dr. Meltzer-Brody and Dr. Hall falsely cited the Board's inaction as vindication, when in fact it was a foreseeable consequence of the deceptive narrative UNC SOM chose to present.

42. Mr. Krehnbrink then started the grievance process with UNC. The grievance was split into different parts by The University of North Carolina. Despite asking at all times for a prompt resolution, the case was delayed by the University of North Carolina at every turn and the process would drag out for the next 14 months. Mr. Krehnbrink alleges part of this plan was to delay so as to frustrate Mr. Krehnbrink, for him to accumulate additional legal costs, and the 11 month delay in having a hearing about Dr. Meltzer-Brody's conflict of interest claim allowed her to remove herself from the start up We Are Exo Inc. and for Emily Maginn to completely erase Dr. Meltzer-Brody from the corporate history. A website that listed Dr. Meltzer-Brody as a partner, had her picture and UNC Bio and a UNC School of Medicine logo under "partners" was deleted. Even though saved and used as evidence, Dr. Meltzer-Brody would later say she didn't have any official involvement with We Are Exo, Inc, even though she used multiples of false claims by Ms. Maginn in official UNC interviews and documentation.

43. UNC's EOC office started the process, and Mr. Krehnbrink asked them to only officially investigate the retribution for filing a grievance. He did not want to pursue a reverse discrimination claim with UNC. Initial retribution claims are difficult for the complainant because there isn't any avenue to procure evidence. It was difficult for Mr. Krehnbrink to explain what happened when he himself hadn't been told why his contract wasn't renewed, nor explained why he was reassigned. Mr. Krehnbrink stated facts as he knew them and put his official reassignment date of July 26 on his complaint. UNC investigators got emails and testimony during their investigation that showed Dr. Meltzer-Brody was leading an effort to terminate Mr. Krehnbrink the day after the grievance filing and that the internal reassignment was actually July 12th. UNC EOC could have adjusted the complaint based on the evidence, but instead focused on events after that date as justification for a reassignment that had already happened.

44. UNC EOC's initial ruling on December 12.2023 was that Mr. Krehnbrink engaged in protected activity, that UNC Psychiatry was aware of the protected activity, and that Mr. Krehnbrink suffered an adverse action. But then for the final determination of cause, only needing "more likely than not" due to the grievance filing, the investigators said the reassignment wasn't due to the grievance, in summary, because UNC Psychiatry leadership said it wasn't.

45. Upon information and belief, Plaintiff asserts that Dr. Samantha Meltzer-Brody made materially contradictory statements regarding her involvement in employment actions taken against Plaintiff. The

University of North Carolina's Equal Opportunity and Compliance Office (UNC EOC), in its investigative findings, explicitly identified Dr. Meltzer-Brody as having misrepresented her role. Although Dr. Meltzer-Brody claimed to have recused herself from any decisions relating to Plaintiff following the filing of his grievance, the UNC EOC's review concluded that she remained directly involved—if not leading—in all pertinent communications, including emails, phone calls, and decision-making processes concerning Plaintiff's reassignment and employment status. The legal standard for retaliation is "more likely then not" but UNC EOC was demanding Mr. Krehnbrink produce some sort of written confession as the only acceptable evidence when it was obvious from the documentation and the deception by Dr. Meltzer-Brody that it was "more likely then not".

46. As evidence, seven months later, in a separate defense offered by Dr. Meltzer-Brody regarding Plaintiff's conflict of interest allegation, her defense was, unbelievably, that the reassignement wasn't due to a conflict of interst, she said Mr. Krehnbrink was reassigned because of concerns for what he wrote in the greivance. This is on recorded video. This constituted a direct admission of retaliation for Mr. Krehnbrink's filing of grievance and is evidence that her prior statement to the UNC EOC were false. Despite this clear contradiction, and Mr. Krehnbrink pointing out to UNC EOC's this was on recorded video, the University elected to disregard the inconsistency, characterizing the conflicting mutually exclusive statements as arising in "two separate cases," thereby failing to hold Dr. Meltzer-Brody accountable for the material misrepresentation made during an official internal investigation.

47. Plaintiff further alleges that the timing and substance of the University of North Carolina Equal Opportunity and Compliance Office's (UNC EOC) investigative findings raise serious concerns regarding institutional bias and preferential treatment. The findings were released one day prior to Dr. Samantha Meltzer-Brody was the heavily promoted featured speaker at the December Commencement address for the University of North Carolina. During her speech, she which she spoke on the values of "compassion and listening," particularly toward individuals with whom one may disagree. Dr. Meltzer-Brody and Mr. Krehnbrink didn't agree on her extreme DEI policies and she never reached out with compassion and listening, she froze his salary for two years and 'silently terminated' him. Plaintiff asserts that the University had a vested interest in protecting the reputation of Dr. Meltzer-Brody and, by extension, the institution itself, and that this interest improperly influenced the handling of Plaintiff's grievance and related findings.

48. Plaintiff contends that public acknowledgment of Dr. Meltzer-Brody's alleged misconduct—including acts of retaliation, discriminatory employment decisions, diversion of diversity-designated funds to female executive leadership, retaliatory terminations in response to protected activity, and abrupt employment actions designed to humiliate or destabilize employees—would have been deeply damaging to the Dr. Meltzer-Brody's reputation and to the University's public image.

49. Plaintiff alleges that the University of North Carolina's Equal Opportunity and Compliance Office (UNC EOC) improperly considered the potential legal and regulatory exposure to the University and its senior officials in reaching its conclusions. Specifically, Plaintiff contends that a formal finding against the UNC School of Medicine, Department of Psychiatry—particularly a finding of unlawful retaliation resulting in harm to mental health patients—would have exposed the University to significant civil liability, including potential lawsuits by affected patients. Moreover, such a finding would have subjected Dr. Samantha Meltzer-Brody and Dr. Zachary Hall to possible disciplinary proceedings before the North Carolina Medical Board for professional misconduct. Plaintiff asserts that these extraneous considerations unduly influenced the investigatory process and undermined his right to a fair and impartial review based solely on the factual merits of his claims, rather than on the University's desire to mitigate institutional risk and shield senior leadership from accountability. Dr. Meltzer-Brody herself said the reassignment was due to the grievance filing, but nothing was done by the University. As a matter of fact the School of Medicine promoted Dr. Meltzer-Brody in March of 2025 to an Executive Dean.

50. Plaintiff further alleges that the UNC EOC has exhibited a pattern of selective enforcement and institutional protectionism, citing as corroborating evidence a separate and unrelated matter currently under review, involving the University's EOC's office handling of enforcement (or lack of) for a UNC basketball players discipline requirements. In that case, too, allegations have been raised that UNC EOC deviated from its stated policies and procedures in order to help a high profile person (basketball player).

51. Mr. Krehnbrink used the interviews and internal emails in the UNC EOC report to correct the Retribution complaint and filed an appeal with the University on January 22, 2024. Per policy, the University of North Carolina's Faculty Grievance Committee was charged with handling the appeal. That committee spent 5 months trying to figure out a procedure. They admitted to being stuck with not feeling qualified to make a ruling on what they thought was a human resource issue. Months went by without any movement. Mr. Krehnbrink continued to ask every month for a timely resolution. Mr. Krehnbrink suggested an independent human resource investigator as an option. Mr. Krehnbrink offered he would completely accept that experts decision and even offered, if the ruling was "no retribution", to drop all further actions and give a full apology to Dr. Meltzer-Brody and the UNC School of Medicine. This offer was declined.

52. On February 1, 2024 Mr. Krehnbrink filed an EEOC complaint because the University of North Carolina continued to delay proceedings.

53. On March 24, 2024 UNC filed their official response to the EEOC complaint for the non renewal. The only reason UNC Psychitry could come up with for the non-renewal was Mr. Krehnbrink's protected activity with the advocacy/whistle blower letter to the Dean. There wasn't a single job related concern given to the EEOC.

54. Plaintiff asserts a procedural and substantive objection to the inclusion, by Dr. Samantha Meltzer-Brody, of a letter authored by Emily Maginn, CEO of that third-party previously described in the conflict-of-interest section, known as We Are Exo Inc, as part of the University of North Carolina's defense in this matter. The letter in question contained allegations that Plaintiff's development of an intake application posed potential harm to patients. Plaintiff denies the substance and admissibility of these claims for several reasons: (1) the application referenced in the letter was never implemented or used with patients during Plaintiff's tenure at the University; (2) Ms. Maginn was not an employee, agent, or representative of the University of North Carolina or the UNC School of Medicine, and therefore lacked standing to issue evaluative commentary treated as internal institutional documentation; (3) the existence of the letter was never disclosed to Plaintiff during his employment, and no concerns regarding patient safety were ever raised with him by his supervisors, including the Department Chair, which would have been standard and expected practice had there been legitimate concerns about patient harm; and (4) Dr. Meltzer-Brody later denied any affiliation or involvement with We Are Exo, yet it appears she personally received and submitted this undisclosed correspondence and other comments from Ms. Maginn in support of the University's position, suggesting undisclosed coordination and use of external materials to discredit Plaintiff without procedural fairness or opportunity for rebuttal. On March 21, 22034 Mr. Krehnbrink received a right to sue letter from the EEOC.

55. Mr. Krehnbrink did not file a lawsuit at this time because he was still involved in the UNC grievance procedure and wanted to give that process a chance and he mistakenly believed that UNC would have to address all the lies piling up from the UNC SOM psychiatry. He knew he had 90 days with the EEOC but also knew that as a North Carolina State employee he could file within 2 years under Federal and state laws, which is this lawsuit.

56. The Faculty committee chair trying to work out a procedure for the appeal had their term expire in July 2024 and left the committee. The new committee chair, Akaa Ayangeakaa, worked out with the University's Legal Department that the committee didn't actually have to have a hearing as promised, or even make a ruling, only that they had to 'deal with it'. So the new chair sent it right back to UNC EOC's office who immediately, and without any conversation with Mr. Krehnbrink, denied the appeal. Mr. Krehnbrink waited 5 months with promises of some sort of hearing or procedure only to get an email one day that his appeal was denied by the very office he was appealing against. Mr. Krehnbrink claims the idea of an appeal is to a higher or different authority, not sending it right back to whom made the original ruling and whom Mr. Krehnbrink had alleged was giving Dr. Meltzer-Brody special considerations.

57. Mr. Krehnbrink requests the courts assistance in the grievance retribution ruling because the grievance process brought out that direct admission of retaliation for filing the grievance and this has been ignored the the Univeristy of North Carolina. After having the retribution appeal be denied, the faculty grievance committee moved on to hold a hearing June 30, 2024 on a conflict of interest claim. As previously mentioned Dr. Meltzer-Brody's defense for the conflict of interest claim, when asked

directly, was that the reassignment wasn't due to a conflict of interest, it was because "Mr. Krehnbrink's grievance was affecting his ability to provide what we would consider to be appropriate mental health care". This is directly opposite to what she told UNC EOC's office that the grievance had nothing to do with the reassignment. This was direct admission the resassignment was because of the grievance filing. Dr. Meltzer-Brody's testimony is written in the UNC EOC report and recorded on video for the conflict of intersest hearing. Mr. Krehnbrink pointed out to the The University of North Carolina Faculty Grievance Committee and to the UNC EOC office that Dr. Meltzer-Brody was using two mutually exclusive defenses and that she had admitted it wasn't "more likely then not", she directly answered it was. Neither the committee or the UNC Office did anything because they said she was allowed to use different defenses because they were "two separate issues". They weren't separate issues, they were part of a complex case.

58. Mr. Krehnbrink requests the court's assistance declaring there was retribution in the reassignment out of clinical duties as evidenced by Dr. Meltzer-Brody's own testimony.

59. Mr. Krehnbrink requests the court's assistance declaring there was retribution in the form of the contract non-renewal for whistleblowing/protected activity in regards to writing the dean about the alleged discrimination in the department. UNC's own official response doesn't list a single job-related issue/complaint/concern. UNC lists Mr. Krehnbrink's advocacy letter as the primary reason, which in the absence of any other reason, is admission of illegal retribution.

60. Mr. Krehnbrink is not asking for any sort of ruling on an actual discrimination complaint or the conflict of interest claim as he believes addressing both retributions claims is sufficient.

61. At the time of the non-renewal of his employment contract, Plaintiff Krehnbrink had accrued ten (10) years of creditable service with the State of North Carolina. The termination of his employment with the University of North Carolina School of Medicine and the subsequent denial of an opportunity to continue in comparable State employment have resulted in significant financial harm, including but not limited to a substantial reduction in his future earning capacity and adverse impact on the calculation of his State pension benefits. Following his release, Plaintiff's best offer to remain in employment with the state of North Carolina was an offer for a nursing position involving statewide travel to inspect nursing homes, at a salary approximately fifty percent (50%) less than his previous compensation. Plaintiff seeks compensatory damages for these financial losses.

62. Plaintiff Krehnbrink suffered substantial psychological and emotional harm as a direct and proximate result of Defendants' conduct. The non-renewal of his contract, followed by an abrupt and involuntary reassignment, occurred without prior notice and under circumstances Plaintiff experienced as traumatic. Plaintiff was powerless to prevent significant disruptions in the care of approximately two hundred (200) patients for whom he had provided diligent and continuous mental health treatment. Plaintiff was further distressed by what he alleges to be intentional patient harm caused by actions taken by UNC SOM Psychiatry. The perception among many patients that Plaintiff abandoned them has caused continuing emotional anguish. Although numerous former patients have contacted him privately and expressed support, Plaintiff is ethically and legally constrained by HIPAA regulations and professional obligations from initiating communication or clarifying the circumstances in public encounters.

63.

64. Plaintiff has been unable to secure employment comparable in scope, responsibility, or compensation due to the reputational damage resulting from Defendants' conduct. Clinics and healthcare employers have been unwilling to consider Plaintiff for employment due, in part, to the unresolved nature of the grievance process and the cloud of legal uncertainty that surrounded him. Defendants prolonged the internal grievance process for a period of fourteen (14) months, thereby compounding the reputational harm and diminishing Plaintiff's employment prospects.

65. Although Plaintiff has since established a private clinical practice, he continues to suffer both financial and reputational harm attributable to Defendants' actions. For example, negative online reviews have falsely accused Plaintiff of "leaving without notice," thereby deterring prospective patients and impacting the success of his new practice.

66. Mr. Krehnbrink engaged in multiple protected activities under the Fair Labor Standards Act's anti-retaliation provision and the Equal Pay Act), including: Sending UNC SOM leadership an internal complaint of gender pay inequity with his Department, Filing a Grievance with the University of North

Carolina on July 9, 2023 with a complaint of gender discrimination, Filing his original Charge of Discrimination with the U.S. Equal Employment Opportunity Commission on February 2, 2023

67. Mr. Krehnbrink alleges there were illegal retaliatory consequences for each of his actions and therefore seeks legal and equitable relief for:

68. Retaliation for engaging in protected activity (e.g., Title VII, North Carolina Whistleblower Protection Act); There was retribution in the form of the contract non-renewal for writing the letter to the Dean of the School of Medicine and there was admitted retribution for plaintiffs filing of a grievance.

69. Section 1983 as part of the Civil Rights Act of 1871 to bring claims for:

70. Violation of the First Amendment (e.g., retaliation for protected speech)

71. Violation of the Fourteenth Amendment (e.g., denial of equal protection or due process)

72. Retaliation by government actors for whistleblowing or protected advocacy

73. *Discrimination based on sex, race, and orientation ( Title VII and 1983);* All other female nurse practitioners had their contracts renewed.

74. Constructive discharge and retaliatory reassignment;

75. Tortious interference with professional opportunities;

76. Defamation and reputational harm;

77. Violation of procedural due process, given his status as a state employee;

78. Negligent and intentional infliction of emotional distress;

79. Breach of implied contract and covenant of good faith and fair dealing

80. Failure to mitigate harm to patients, violating professional and ethical obligations. UNC School of Medicines actions are in violation of both the Equal Pay Act and Title VII of the Civil Rights Act of 1964. Plaintiff Mr. Krehnbrink seeks injunctive relief, compensatory damages, liquidated damages, punitive damages, attorneys' fees and costs pursuant to the Equal Pay Act and Title VII to remedy UNC School of Medicines violations.

81. Plaintiff, Mr. Bryan Krehnbrink, appears in this matter pro se. However, he acknowledges the procedural and substantive complexities inherent in litigating claims involving both federal and state law, and affirms that he would benefit significantly from and is willing to pay and has organizations offering him financial assistance for competent legal representation during trial and subsequent proceedings.

82. Plaintiff has made diligent and good-faith efforts to retain qualified employment counsel within the State of North Carolina. Plaintiff has ultimately been unable though to secure representation due to pervasive conflicts of interest. Specifically, filing against the UNC School of Medicine also includes the University of North Carolina and as a State of North Carolina employee additionally involves the State of North Carolina as a party, thereby rendering this a suit against the State. Collectively it is a suit against the states 2nd largest health care organization, under the umbrella of the state's largest University system, under the umbrella or the states largest employer.

83. As a result, approximately ninety percent (90%) of the attorneys contacted by Plaintiff disclosed immediate conflicts of interest. Moreover, numerous prospective counsel expressed fear of future potential conflicts. Many had personal or familial affiliations with UNC Health as patients or beneficiaries of care, and were concerned about jeopardizing those relationships. Others declined representation on the basis of their professional ties to the University of North Carolina—either as alumni of UNC School of Law or as parents of prospective applicants. Lastly, counsel who were free from institutional or healthcare-related conflicts often voiced reservations about litigating against the State of North Carolina due to the scope and political influence of the state as an employer and legal adversary.

84. In light of these cumulative impediments to securing in-state representation, Plaintiff respectfully requests that the Court grant him leave to retain counsel licensed in another jurisdiction, subject to the Court's discretion and approval under applicable pro hac vice provisions or any other mechanism the Court deems appropriate to permit out-of-state representation. Plaintiff respectfully requests that motions in this case by the defendent be delayed until the representation issue is settled and plaintiff can properly respond.

## IV. Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

no physical injuries.
Emotional distress and menatl anguish during and continueing UNC SOM's alledged illegal actions and alledged intent to cause distress and anguish.

## V. Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

Plaintiff respectfully requests that this Honorable Court grant all relief to which he may be entitled, including but not limited to:
1. Reinstatement of role with back wages and reinstatement of lost employment time in retirement calculations for the illegal contract non renewal. While a return to UNC SOM Psychiatry where Dr. Meltzer-Brody and Dr. Hall still work would be unadvisable, it is possible to return to State Employment under the umbrella of UNC Health's Advance Practice Provider Center and to be assigned to working in a local clinics mental health as a collaborative psychiatric mental health provider and to have no involvement with UNC SOM Psychiatry. If this necessitated a change from being a state employee to a UNC Health employee plaintiff asks for appropriate compensation for lost state retirement benefits.
2. Compensatory damages for lost wages, diminished earning capacity, and loss of pension benefits; if reinstated this amount totals approximately $200,000. If not reinstated this amount is in excess of $500,000.
3. Damages for emotional distress and mental anguish for the illegal retribution to include the job reassingment after filing the grievance which is in excess of $200,000
4. Reputational harm damages and consequential economic loss from both the non renwal and the grievance retribution which is in excess of $300,000.;
5. Equitable relief as deemed appropriate, including but not limited to injunctive relief and corrective statements;
6. Reasonable attorneys' fees and the costs of this action, currently $8,400;
7. Pre-judgment and post-judgment interest as allowed by law; and
8. Any such further legal or equitable relief as the Court may deem just and proper.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: July 22, 2025

Signature of Plaintiff: *[signed]*
Printed Name of Plaintiff: BRYAN WILLIAM KRETVORINK

### B. For Attorneys

Date of signing: _____

Signature of Attorney
Printed Name of Attorney
Bar Number
Name of Law Firm
Address
    City     State     Zip Code
Telephone Number
E-mail Address